Good morning. Gary Silbiger appearing for the petitioner, Mr. Larin-Dominguez. Oscar Larin-Dominguez came to the U.S. at the age of five as a permanent resident, lived in this country for 40 years, and then was order removed by an immigration judge in 2004 when, one, without warning, his attorney failed to appear and did not tell Larin of his right to apply for cancellation of removal. Two, the immigration judge gave him no hope of prevailing on his cancellation of removal application because of the court's erroneous finding of an aggravated felony conviction, even though there were no Ninth Circuit cases on this point in the immigration context. Winning a cancellation of removal application would have resulted in retaining his permanent residence. And three, he was not informed by the judge of any of his rights, including his right to counsel. Clearly, this court has jurisdiction to decide this motion to reopen because Larin was not the subject of removal proceedings at the time of his departure. Under HCFR 1003.23b, that's the Lynn case that this court decided a few years ago. Based on U.S. Supreme Court and Ninth Circuit court cases, we know now that an aggravated felony drug conviction has to be a federal felony conviction or the state equivalent under the Controlled Substances Act or have a trafficking element in it. Larin's California felony conviction for possession of cocaine is not a federal aggravated felony drug conviction, but rather a misdemeanor under federal law. The three Ninth Circuit Casares v. Ashcroft decisions play a major role in this case. Casares I was first published in January 2004 and held that aggravated felony drug cases and immigration proceedings needed to be based on the federal drug statute. The Casares II court required further briefing only on the issue of jurisdiction, so the Casares I decision was withdrawn on April 26, 2004. When that briefing was completed, Casares III was decided on August 24, 2004 with the same holding as Casares I. Well, once it was withdrawn, how would the I.J. know that it would eventually be reissued essentially in the same form with the same holding? Well, what the judge should have done is, because Larin was representing himself at that point, the judge had the obligation to give him some direction on what he could do, what applications might be available to him. When the judge said to Larin, you have no chance of prevailing, a cancellation of removal, the judge either didn't know about the Casares I case or did and did not inform the improper respondent. So the I.J.'s obligation at that point would be to say, well, in January this decision came out. It's no longer good law, but you ought to think about the possibility that the opinion would be reissued. Does the I.J.'s obligation go that far? Certainly, because it was only withdrawn for jurisdiction purposes. The judge should have known that there was a pending third Casares decision that was coming out any time. Sure enough, 20 days later, just 20 days after he was deported, the Casares III decision came out, saving Mr. Larin from deportation. Which means that a competent lawyer should have realized that if the only reason the first one was withdrawn was a jurisdictional reason, that the panel was not hesitating as to the merits, which would have meant then to a competent lawyer that, well, even if there weren't jurisdiction, I've already convinced one panel of the correctness of my decision, or one panel has been convinced. That means very likely that another panel will be convinced because the only thing that was holding them up was jurisdiction. I've got a slightly different question, though, and that is, in the 2004 hearing, when your client says, well, Mr. Lopez, recognizing Mr. Lopez doesn't appear, saying, well, you know, I'm not getting along with him. I don't want him anyway. Did the IJA have an obligation to inform your client that he was entitled to free legal assistance to replace Mr. Lopez? Yes, he had to. The judge had to inform him of the list of free and low-cost legal services, serve him with that list, and tell him he's entitled to a postponement in order to search for a free or low-cost attorney or representative. And you can see where my question is going. He didn't do that, correct? He did not do that. He didn't even say to Mr. Loreen, okay, you don't want Mr. Lopez to represent you, which I think many of us could understand had the lawyer not showing up as he was supposed to that day. But the judge never went the next step, which is also a regulatory requirement and a constitutional requirement as well, that, okay, if you don't want Mr. Lopez to represent you, you do have the right to get a cash for a postponement to find another representative. The judge never went that extra step. There's no reason to imply that Mr. Loreen would know that. That's the obligation of the immigration judge under the regulations. Let me ask you this. Assume for the moment that we hold that it was an abuse of discretion not to reopen the 2004 hearing. What practical difference will that make to your client because he's got a deportation order in 2005? So what are we supposed to do or what significance does that deportation order of 2005 have? It would have no significance at this point. The Lynn case, which I mentioned before, giving jurisdiction on motions to reopen even though an individual left the U.S., Lynn actually had returned to the United States illegally and still the Ninth Circuit found that he was entitled to have his case reopened. The Board of Immigration Appeals has the same view on individuals who have left and come back without permission. And I think the matter of Maloney and the Board of Immigration Appeals sums it up the best. He says when you find a gross miscarriage of justice, the court should not perpetuate that gross miscarriage of justice so that you look at the first denial of due process in the first case and then if it is that extreme as it is in this case, then the later illegal entries into the U.S. are not important or irrelevant. Even though it's not a reinstatement, actually a new removal proceeding was initiated against him in 2005, which is not being challenged on appeal. So what practical effect does the 2004 due process violation, assuming he prevails on that claim, have when the 2005 removal proceeding was a deportable offense in its own right? It was only a deportable offense because of the gross miscarriage of justice that occurred in 2004. And so he then came back to the U.S., again was put in proceedings and ordered deported and left the United States. Then he returned, as you know, a third time and was deported a third time. He's outside the United States at this point. Let me ask you this. So it's... Sorry. In 2004, it's possible that he could have applied for cancellation of removal had he been properly counseled and had the court understood that the prior cocaine possession was not going to be an aggravated felony. What likelihood can we assess here as to his having been granted cancellation of removal? Well, in the record, there is information about his U.S. citizen children, three U.S. citizen children, his parents, U.S. citizens. So, yeah, give me the list. How many U.S. citizen family members were there? What were the ages of his children and so on? I'm sorry, how many? How many U.S. citizen relatives did he have? What were the ages of his children? Kind of lay out the cancellation of removal. His parents, U.S. citizens, three children. His fiancée, who later became his wife, who's in court today, is a U.S. citizen. And I think all of his brothers and sisters, all siblings, are U.S. citizens or permanent residents. They knew from the record that he had been here for 40 years as a permanent resident. That was part of the notice to appear. He had not left the United States during that time. So he was a very long-term permanent resident, came here at a very young age, wasn't familiar with his original country at all, had all his family in the United States, was working for about 20 or 25 years in the same occupation. So he had a very good chance of success in his cancellation of removal proceeding. And was the only thing that stood in the way of cancellation of removal in the eyes of the IJ in 2004 was this prior possession conviction? That's correct. And it stood in the way because in the view of the IJ, this was an aggravated felony under federal law? Yes, exactly. To be eligible for cancellation of removal, an individual cannot be convicted of an aggravated felony. And the judge ruled that he was. And Mr. Green, being unrepresented at this point, not knowing his rights, gave up, basically. The judge was there to assist him as a pro se. Instead, he got the wrong information from him. And certainly information that was available to the judge. I pointed out that in this particular case, the proceeding took place in a detention center in Lancaster, California, a former immigration detention center, where almost every individual who appeared in front of that judge and the other judges there had convictions. So the judge, I'm sure, was very familiar with the defenses and the law on or should have been very informed on the law on aggravated felonies. It was not the first drug conviction case that appeared in front of the veteran judge. And was your client then in detention? He was in detention. Right. So when he's saying, I'm giving up, he's in detention. I mean, we understand the situation of those people. He's seeing the possibility of either I stay here for a while and get deported or I get deported right now. That's how he appears to have understood his choices, even though those might not, in fact, have been his choices. Yes. He wanted to fight his case, as shown by retaining an attorney. The attorney then gave up on him without notice. And the judge said there was no alternative. You have no defenses. He didn't inform him of his right to another or postpone for another attorney. So it's understandable that he would have followed the judge's remarks and basically given up his case. And so when he waived his right to appeal, that certainly was not an intelligent and knowing waiver as well. Were those waivers explained to him in detail by the immigration judge? His rights? Yes. No, there was. On the first day of his two-day court proceeding, he had an attorney, and the record specifically says the attorney waived the reading of rights, as is often done when an individual is represented in court. So in the second time, second court date, when Mr. Lurine appeared on his own, the judge never then read him his rights as he should have to inform him of all the rights that he had. It was never read to him. His attorney also did not tell him of his eligibility to apply for cancellation of removal. So that may have been the first time he had ever even heard of the word when he went into court that day. All right. You may want to spend or save a few minutes of your time. Okay. Thank you. Thank you.  May it please the Court? Jeanette Allen, co-respondent with the Attorney General. Your Honors, a careful review of the transcript here shows that the immigration judge did cautiously protect Petitioner's rights at every step of the proceeding. Was he required to inform him that he could get free legal counsel? Your Honor, during the initial hearing, Petitioner's counsel waived the advisals that are required under the regulations, and Petitioner has never claimed that his attorney did not provide those advisals to him at the time when he waived the reading. You know, so let me make sure I understand your argument. So on the first day, his lawyer is with him, and his lawyer says, I waive any reading of rights. The next day, the lawyer is not there, and he says, My lawyer hasn't appeared. I was having trouble with him anyway. I just, I don't want him. And how do we know that this lawyer who doesn't appear on the first day said to him, You know, if you fire me, you can get a free lawyer? Do we have any confidence at all that that would have been said by the lawyer himself, who's about not to show up? We also don't have any confidence that the lawyer did not, because he's never made that argument. But if you turn to the transcript... Who's never made that argument? He's never made the argument? He's never said that he didn't understand that he wasn't given the advisals by his attorney, who did appear and represented him and declined to hear the advisers from the immigration judge. You know, I'm fairly familiar with the sorts of advice that immigration lawyers do give to their clients, and it's usually not on the list to say, And you know, if you become dissatisfied with my services, you're entitled to somebody else for free. If you review the dialogue between the immigration judge and petitioner, petitioner was given multiple opportunities to have his hearing continued, during which time he could have sought assistance. And if he had accepted the 30-day continuance offered to him, he would have then, the new case would have come out. I mean, he's in his position. I understand that, but I'm still working on this question as to whether or not it's realistic for us to think that he knew that he could get free counsel, now that Mr. Lopez has failed to show. I'm not sure. Realistically, you know, it's difficult to know exactly what was in petitioner's mind, but from the transcript, we do have language between the immigration judge and petitioner from which we can glean that petitioner understood that he was being offered time to continue to, to receive a continuance to determine how to proceed with his case. No, that part I totally agree. He repeatedly declined. The immigration judge asked him, I, he gave him an opportunity. I can read from the transcript. Well, let's say that he had availed himself of that opportunity for continuance, and his counsel appeared at the next hearing, and this is prior to our court reissuing that decision that was withdrawn in January. What would the attorney's obligation be at that point in terms of advisements or requests to the IJ in order to comport with due process? Does that attorney then have the obligation to say, well, you know, there's this uncertainty regarding the law, and you need to preserve your rights in some way, and if the attorney doesn't do that, does that somehow deprive him of due process or a fair hearing? If, well, if he had accepted the continuance, if I understand your question correctly, it was for 30 days. Right. Assuming that he was represented by counsel, what would counsel's obligation be at that point in order to comport with due process? At that time. Given the state of the law at the time his hearing went forward. Right. If you turn to the standards for informing, the requirement to inform a petitioner of his apparent eligibility for relief, the apparent eligibility for relief does not extend beyond the binding law in existence at that time. And at the time of his hearing, the immigration judge acted as his counsel and informed him of his apparent eligibility on the law at the time, which was based on a matter of Yanis Garcia, which is a board decision, which said when there's an absence of circuit precedent regarding drug convictions in the immigration context, we apply the law in the sentencing enhancement context. And in U.S. v. Rios Beltran, which was binding on the immigration judge at the time of petitioner's hearing, his conviction for possession of cocaine would have constituted an aggravated felony, because in the sentencing context, if it's a state felony, that is sufficient. So even if attorney had been present, I understand your question, his duty to inform petitioner of his apparent eligibility for relief would not have extended beyond the law binding at the time. Let me ask you this, though. If he had said, listen, I would like a continuance of 30 days in order to get the free counsel that you just told me I'm entitled to have, so he finds new counsel and he comes back into the immigration court 30 days later, what will be the state of the law at that point? 30 days later, the Casares-Gutierrez III would have been issued. So 30 days later, if he'd accepted the continuance, and even come back pro se, but accepted the continuance with the new free lawyer that he, I'm now hypothesizing, that he knew he could get because the I.J. told him he could get it, at that point, he's eligible for consideration for cancellation of removal. Is that right? Yes. If petitioner had not voluntarily and knowingly waived his right to counsel. No, that's exactly what I'm saying. If he had said, I would like a continuance. Yes. And I would like to take you up on what you tell me I can get, which is free counsel. So when he comes back in in 30 days, he's then entitled to apply for cancellation of removal. Yes. Yes. And he might or might not have got it. But given what we know about him, there was a decent chance he would have gotten it. And I do want to return to a question that you asked, petitioner's counsel, which is the likelihood of him receiving it. Yes, right. Exactly. And I do want to point out that the immigration judge, when assessing petitioner's eligibility for voluntary departure, pointed out that he would not have been inclined to grant voluntary departure as a matter of discretion based on petitioner's convictions. He had a crime of domestic violence conviction, which the conviction records are in the conviction that's in the record here. He said he would not be inclined to exercise discretion favorably. And the question of favorable or unfavorable exercise of discretion is the same in the cancellation of removal context. So it's fair to say that even if, jumping over all these hurdles hypothetically, the immigration judge considered it in the post-Casares-Gutierrez III context, he might not have been inclined to favorably exercise discretion, given he wasn't inclined to do so. Right. To show prejudice at this stage, what do we have to show? Plausibility? I'm sorry? In order to show prejudice, as we look at the case now, what do we have to show, plausible ground for relief? The, in order to show prejudice, I would, the first step in order to determining whether you, before asking whether prejudice exists, is to determine whether there has been an error. And the government's position is here, they were fundamentally fair hearing. Gotcha. But the prejudice question is whether the attorney's conduct may have affected the outcome of proceedings. But the immigration judge cured any defect caused by the attorney's actions. I want to back up right there. May have affected, and I think the way we then give a gloss on that, is there a plausible ground for relief? And we don't look at plausible ground in the sense of what this I.J. would have done. This I.J. might have done, as you're suggesting. But plausible ground is, do you have plausible grounds as to which a generic I.J. would have done it? Do you agree with that statement of the law? I understand that statement of the law, yes. You understand it, but your mayor may not agree. Well, I would like to emphasize that it's a due process allegation. I don't want to bully you into agreeing with something you don't agree with. I'm sorry? I don't want to bully you into agreeing with something you don't agree with. I would just ask the Court to question first whether. . . He's not an immigration judge. To ask, first, before reaching the prejudice question, to ask whether Petitioner received a full and fair hearing. And in this case, Petitioner did, because albeit there was a defect in his attorney's failure to appear, but that defect was cured by the immigration judge's repeated efforts to provide Petitioner with opportunities to pursue his rights, to seek continuance, to determine how to proceed. He offered him the opportunity to apply for cancellation. He explained the standards for cancellation, and he said, I'm not sure whether you have this conviction. . . If you have a conviction for possession of cocaine, it would render you ineligible. If you do not, it would not. Here are the standards. Would you like to apply for cancellation? Let me ask you this, counsel. Given that the 2005 removal proceeding is not being challenged, what practical effect does it have, even if he prevails in showing that there was a fairness, fundamental fairness problem with his 2004 proceeding? It has a significant practical effect, because even if he prevails here and the Court finds that the Board abused its discretion in denying the motion to reopen, the 2005 removal order remains unchallenged. He conceded removability. He waived appeal. And it's – it continues in effect, and it has, in fact, since then been reinstated. I'm correct that when he reentered the second time, when he reentered after this particular removal proceeding in 2004, DHS instituted a new separate and independent removal proceeding, and it wasn't a reinstatement from the potentially defective 2004 proceedings. Is that correct? Yes, Your Honor. It was an entirely separate and independent removal proceeding under INA 240. It did not relate back in any way to his initial hearing. He wasn't charged with reentering after deportation. He was charged with simply entering without inspection, a charge which he conceded and later waived appeal. And under this Court's decision in Hernandez-Almanza, the Court was faced with a question as to even if the Petitioner had a conviction for possession of marijuana, which was later vacated, he then entered without inspection, was placed in proceedings, a second 240 proceeding as here, and challenged the first proceeding. And the Court said that even if we agree that there was a gross miscarriage of justice and we vacate the first proceeding in its entirety, the second removal order, the second offense here is a deportable offense in its own right, which may be executed. And here he has to reenter in order to challenge the deficiency of the 2004 proceeding. Could he have done it while still abroad or have family challenge the 2004 proceeding for him? He could have. A number of the cases to which Petitioner cites in his brief are examples of this. He relies on cases where Petitioners have had vacated convictions and have challenged their removal orders from abroad. And in each of those cases, Estrada-Rosales, Widersberg, and Mendez, which are cited in both briefs, in each of those cases, the Court emphasized the fact that Petitioner remained abroad to challenge the lawfulness of the initial removal. Another distinguishing factor is in those cases, Petitioner's removability in itself was at issue. And here, removability has never been at issue. Even from the 2004 hearing, the crime of domestic violence offense was conceded. He was removable, and his lawful permanent residence status ended at that time. The question in here is different because it involves relief, and it's therefore distinguishable. Well, going back, I mean, if he had had competent counsel to begin with, all of this might never have happened. Now, let me ask you this. My notes show that Loren told the IJ he was going to dismiss Lopez. That was his lawyer. Now, what do you know about Lopez, the lawyer? Do you know anything about him? Is he actually a lawyer? Is he a member of the California Bar? As far as I'm not sure exactly, Mr. Lopez personally. You know that a disbarred lawyer can practice before the IJ and the BIA. Petitioner has not asserted that. I'm telling you that. Yeah, okay. Yeah, and you just take the odds on many cases that we've seen or that I've seen because I keep track of that. Oh, there's a high percentage of people who are being represented by lawyers and notorios who are corrupt. They take their money. They don't do anything about it. They don't show up in court. They make their cases, the situation, worse than it ever was. And here's a man. He comes in, and Loren said to the IJ that he was going to dismiss Lopez from representing him anyways. And he was hoping the IJ would give him voluntary departure. And he was ready to just give in. He just quit. He was right there. And the IJ said, well, he wasn't likely to give him voluntary departure. And he pointed out convictions on multiple matters of domestic violence. Were there trials in those matters or just a plea?  I'm not sure, Petitioner. What was the background? He conceded that he had been convicted for each of those offenses. What? I do know in the record when asked about the offenses, he acknowledged that he had been convicted for the multiple domestic violence convictions. I understand you're concerned about that. What do we know about the background of those matters? I'm not sure about Mr. Lopez's background. You know nothing about Lopez. Beyond the fact that he appeared for the first hearing and then he didn't show up. He's a wonderful lawyer, isn't he? He's very loyal to his client. The government does not condone Mr. Lopez's actions. Well, you're condoning it by your very action here today. And you have an immigration judge that puts pressure on him. And finally he says, well, he's ready to just give in. He's not going to get voluntary departure. He's reminded of his past misdeeds. Was any consideration given by the immigration judge to how long he's lived in this country, how many children he has here, the status of his family members, how long he's worked at the same job? Was any of that considered? Your Honor, the immigration judge here gave great consideration to petitioner's rights. Well, I don't read the record that way. And that's why we're here, not to condone Mr. Lopez's actions. I just read this as giving him sort of the brush off. You know, I'm not going to give you voluntary departure. This happened. And you'd think the immigration judge, as Judge Fletcher pointed out, would be aware of these cases moving through the system that would change the whole picture here on aggravated felonies. And so what did the immigration judge tell him about his right to counsel and the importance of having a competent lawyer and all the rest of it? What did he say about that? That's part of the immigration judge's job, isn't it? The immigration judge asked Mr. Marín Domínguez. I asked you what the immigration judge told him. What did he tell him? How did he educate him on his all the rights that he supposedly waived? The immigration judge, under this Court's standard for waiver of right to counsel, the question is whether the standard is that immigration judge must inquire whether. The standard is high. The standard is one, whether the immigration judge must inquire whether petitioner wishes to concede, and two, petitioner must give a knowing and voluntary response. That's under Tawadrous v. Ashcroft, and that occurred here. Here, the immigration judge inquired whether petitioner wished to continue, and he did so multiple times. He said, do you want me? He asked initially. He gave him the opportunity to receive 30 days. Petitioner says, well, you know, I was just ready to give in. And then the immigration judge later, do you want me to proceed today without? Yes, sir. The attorney to help you? Yes, sir. Are you sure? I'll give you time to think about it if you want more time to think about it. I would have liked about a week. That would have been fine, but you can't. Yes, you can't give me that, so I might as well just go ahead. Yeah, well, he's setting him up. He satisfied the standard under this Court's precedent for a knowing and voluntary waiver of the right to counsel. No, I see nothing voluntary or knowing about that. Did he instruct him? Did he tell him how important it was to have a lawyer? He inquired whether Petitioner wished a continuance to speak to counsel. He's to find a free lawyer, huh? Where was he going to go? He. Where was he going to go? Where was he going to go to get a good lawyer? Huh? He declined. He just said he gave up. That's what I read here, too. The government's position. And that's a just system that we're proud of. The government's position is that under this Court's standard for a knowing and voluntary waiver of the right to counsel, Petitioner waived his right to counsel. I don't think so. He declined to apply for cancellation of removal. Yeah, yeah. And then he waived his right to appeal. He's here. He's just given up all hope. He asked the immigration judge to just get it over with. Yeah. The immigration judge had very little options here other than to end the hearing. He asked him repeatedly, are you sure? I'll give you time to think about it. The immigration judge honestly had his hands tied by Petitioner's responses. I mean, what should he have done? Continued it against Petitioner's wishes? Well, I don't think the I.J. was ill-intentioned here. I think the I.J. made a mistake. That is to say, I think the I.J. was required to say to him, you know, I understand your dissatisfaction with Mr. Lopez. It's obvious to me that he didn't show up today. And your answers tell me that you have other reasons to be dissatisfied with him because you say you were dissatisfied with him or get rid of him. Those I don't have my hands on. But I understand you have likely very good reasons not to want Mr. Lopez. And your experience with American immigration lawyers might not be so good. But let me tell you that there are some good immigration lawyers, and you're entitled to have one free of charge. I have a list here. Would you like to have a 30-day continuance during which time you can search out a good immigration lawyer who will work for you for free? He didn't say that. And because he didn't say that, I very well understand that Mr. Loren is incarcerated. He's been given to understand, well, his lawyer is so hopeless he isn't even showing up to help defend him. The I.J. is saying, well, I'll give you a continuance, but I'll tell you what's going to happen at the end of the continuance. You're just going to get deported. And he says, well, if that's going to happen, and the only thing that I get my – if I'm incarcerated for the next 30 days, well, of course I'm going to give up. I would give up myself in that same circumstance. A competent lawyer at this time in front of this I.J. would have told him, you bet you should take a continuance because this other case that's been withdrawn that's absolutely in your favor and would allow you to seek cancellation or removal has been withdrawn in order to determine a jurisdictional question. Not withdrawn because of hesitation about the decision on the merits. And at a minimum, we need to wait to see what happens on that one. And we've got a unanimous three-judge panel on the merits telling us that this is not an aggravated felony. No lawyer in his right mind actually understanding the circumstances of this case and understanding the law would have passed up a chance for a continuance. So I have real trouble thinking that he got a fair shake out of this I.J. I'm not saying that the I.J. was ill-intentioned, but I think the I.J. made a mistake. Your Honor, if you – I mean, the I.J. could have told him about clinics that UCLA has, that USC has, that Loyola has, huh? Did he do that? Your Honor, if you're inclined to find – Well, just say no and get it over with. No. And you can say what you want to say. No, he didn't. He did not explain the legal clinics in the area to him. Well, that's where you get good representation. Your Honor, if you're inclined to find – Except for a counsel who's sitting at the table now. I'm sorry? Except for a counsel who's sitting there, Mr. Silber. You know, the immigration laws are next in complexity to the Internal Revenue Code, right? Next? I'm not sure if they're not above that. Your Honors, if you are inclined to find that the Board abused its discretion insofar as it determined that Petitioner received a full and fair hearing, that it's important to emphasize the practical impact of Petitioner's subsequent actions in violating U.S. immigration laws and reentering this country twice. Both of the hearings or both of the proceedings that resulted from those actions have consequences for Mr. Dominguez, regardless of what happened during the 2004 hearing. The 2005 removal order was then reinstated, and now under INA 241A5, Petitioner is ineligible statutorily for the relief he claims he would seek upon reopening. Well, you know, times are changing. The law changes. Whether it's trial or it's hope. And under this Court's precedent in Hernandez-Almanza, even these changes, the impact they might have on the first removal proceeding would not affect the second one. Petitioner remains removable and subject to reinstatement order, which renders him statutorily ineligible for cancellation. For that reason, even if the Court is inclined to find that his proceedings were not full and fair, any remand would be futile because Petitioner is ineligible based on his subsequent actions for the one form of relief he claims that he would seek, cancellation of removal. Well, a lot of things we think are futile, but they don't turn out to be that way. When you live long enough, you'll understand what I'm telling you. Well, at the very least, the impact of the reinstatement order on Petitioner's current eligibility relief should be considered. If there are no further questions. You're doing a great job for the government. Thank you. We appreciate your being here. Thank you. Nothing further. Thank you. Briefly, as the government attorney just said, the two most recent removal hearings have a consequence to Mr. Lurine. They sure do. He has been in immigration detention or out of the country for most of the last eight years based on illegal activities that he was a victim of. Now the government says he's been a victim. There was a terrible lawyer who never showed to court. The judge was wrong. He wasn't told his rights. But we should forget about that and just look at his need to come back and support his family. He was the sole supporter of his three U.S. citizen children. And by the way, there has not been a reinstatement order. There's nothing in the record to show that he was served with a reinstatement order. Our brief talks about how a reinstatement order has to be filed. Can I stop you right there? I mean, we've just got two flatly inconsistent statements. The government says there has been one. You say there hasn't been one. And maybe at some point we can get the government to tell us how it thinks or how it knows that there's been one. And you say, I think as best you can. Well, I've never received one, and I've got no other indication there is one. I mean, what are we supposed to think? We've got lawyers telling me two different things. Because in order for there to be a reinstatement order, the regulation requires that it be served on the individual. There are certain requirements. The regulations require certain things. The individual has the right to reply to the reinstatement order. The government would have introduced that into the record if there was such an order served on Mr. Lorraine. There wasn't. There's nothing in the record. If they have – if he was served properly with a reinstatement order and the government didn't show it in this case, then it's way too late for them to now bring that up. Let me assume then for the purpose of this question that we don't know, and there may very well be no reinstatement order from the 2005 deportation order, removal order. Nonetheless, the government says we've had two illegal reentries since the 2004 removal order. And the government says he is statutorily ineligible on account of those two later removal orders for cancellation or removal, which is the sole relief he seeks. What's your response to that? And I don't want a legal response. I don't want – it's an unfair response. Well, that's exactly the scenario of the Lynn case, Lynn v. Gonzales. That's in our brief. He also came back illegally. He was allowed to reopen his case. I mentioned the matter of Malone, the Board of Immigration Appeals decision that says that once there's a gross miscarriage of justice, the court case should not perpetuate that problem. So we have at least those two cases, one in the Ninth Circuit, one in the Board of Immigration Appeals, allowing an individual to reopen their case, even though they illegally came back into the U.S. according to the decision. There's not a stoppage of it because they realized that when you're attacking legally something that happened at a first proceeding, that everything that happens afterwards is based on that first proceeding. And the individual already has suffered a great deal because of the gross mistakes that were made the first time. So your argument is that if the BIA reopens the 2004 proceeding and then upon reopening it says, oh, well, it's quite clear that this was not an aggravated felony, therefore he had a right to apply for cancellation of removal, and goes through and says, well, under the circumstances that existed at the time in front of the I.I.J., well, this new I.I.J. we're sending him back for a hearing for somebody else, this new I.I.J. grants cancellation of removal. Your argument is then the later reentries essentially disappear because he never would have been successfully removed. Is that the argument? Yes. Yes, that's the argument. And there's no case that I have seen that excludes, that stops somebody from having their case reopened because of illegal entries. And because there is no reinstatement order on the last one at least, the one that we're in right now, the government cannot use that as a reason for saying there's no defense that Mr. Levine has. By the way, I just want to point out that the recent case of Montes Lopez v. Holder decided at the end of last year, 2012, says that no prejudice is needed when counsel has been denied. The citation is 694, Fed Third, 1085. You put that on the cum sheet. Give it to him. And by the way, and so you can see we are challenging the 2005 and 2008 orders. We're challenging it on the basis of Mr. Levine not having to suffer those consequences. We're not specifically looking at what happened during those last two deportations except to say that based on the first court case, those other two are not of any significance, have no significance. Okay. Thank you very much for your time. Thank you. The matter is submitted.
judges: Pregerson, Fletcher, Nguyen